**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAR CHARGING GROUP, INC., a Nevada corporation, 350 HOLDINGS, LLC, a Florida limited liability company and 350 GREEN, LLC, a Virginia limited liability company, | ) ) ) ) ) | Case No.: 13-cv-03124 |
| | ) | (Consolidated with) |
| v.          Plaintiffs, | ) ) | Case No.: 13-cv-04020 |
| JNS HOLDING CORPORATION, a Delaware corporation, and JNS POWER & CONTROL SYSTEMS, INC., an Illinois Corporation, | ) ) ) ) ) ) | Hon. Elaine Bucklo |
|      Defendants. | ) ) |  |

(Consolidated With)

| | |
|---|---|
| JNS POWER & CONTROL SYSTEMS, INC., an Illinois Corporation, | ) ) ) |
|          Plaintiffs, | ) ) |
| v. | ) ) |
| 350 Green, LLC, a Virginia limited liability company | ) ) ) |
|          Defendant. | ) ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Car Charging Group, Inc. ("CCGI"), 350 Holdings, LLC ("350 Holdings"), and 350 Green, LLC ("350 Green") (collectively, "Plaintiffs"), pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56, submit the following Memorandum of Law in Support of their Motion for Partial Summary Judgment:

## I.    **Introduction**

Plaintiffs CCGI and 350 Green are both service providers for electric vehicle ("EV") charging stations across the United States.  In July, 2012, CCGI and 350 Green entered into negotiations for CCGI's purchase of all the stock (and via such acquisition, the de facto purchase of all assets) of 350 Green (the "Transaction").  Part of the assets contemplated in the purchase included a grant for $1,911,000 by the City of Chicago, to install a network of Electric Vehicle charging stations in the Chicago area (the "Chicago Project"), and the assets and liabilities related thereto.  On March 8, 2013, CCGI, its subsidiary 350 Holdings (collectively, the "CCGI Entities"), and 350 Green and its members, Mariana Gerzanych ("Gerzanych"), and Timothy Mason ("Mason") (hereinafter collectively, the "350 Members") executed an Equity Exchange Agreement (the "Exchange Agreement") governing the terms of the transaction.  After the execution of the Exchange Agreement, and prior to closing the Transaction and independent thereof, the CCGI Entities requested 350 Members execute a non-compete agreement.  The 350 Members, after sending CCGI their signature pages, then refused to close the Transaction.  After the CCGI Entities initiated a lawsuit in the United States District Court for the Southern District of New York to enforce the terms of the Exchange Agreement (the "New York Action"), the Parties subsequently closed the Transaction on April 22, 2013.

However, during the pendency of the New York Action, on April 17, 2013 (at the time unbeknownst to the CCGI Entities) JNS Power and 350 Green executed an Asset Purchase Agreement (the "APA") via which 350 Green purported to sell assets related to the Chicago Project to JNS Power.  It is Plaintiffs' position that, as a matter of law, the Equity Exchange Agreement, which did not contain either a definitive closing date nor a time is of the essence clause, was always binding on 350 Green and the 350 Members, so the 350 Members did not have authority to execute the APA nor sell the Chicago Project.  Further, at the time it executed

the APA, JNS Power had knowledge of both the existence the Exchange Agreement and the New York lawsuit. Consequently, it is Plaintiffs' position that they are entitled to summary judgment on Count I of their complaint seeking declaratory relief, as there is no genuine issue of material fact that the APA is void as a matter of law.

## II.   Uncontested Facts

In furtherance of the negotiation of the Transaction, on or about July 5, 2012, CCGI and 350 Green executed a binding term sheet agreement (the "July Term Sheet"), which allowed for CCGI to conduct due diligence on 350 Green to determine if it wished to proceed forward with the negotiation and execution of a final binding agreement through which CCGI, via a designated affiliate, would purchase all of the issued and outstanding membership interests of 350 Green [Farkas Declaration, ¶4-6].

During CCGI's due diligence, it was discovered that although 350 Green had been awarded a grant for $1,911,000 by the City of Chicago for completion of the Chicago Project, by the time the parties had entered into the July Term Sheet the grant funds awarded by the City of Chicago had been depleted and all work on the (unfinished) Chicago Project had ceased. [Farkas Declaration, ¶8].

In light of this discovery during the limited due diligence performed by CCGI, CCGI requested that 350 Green enter into a new binding Term Sheet which was executed on August 29, 2012 (the "August Term Sheet"). [Farkas Declaration, ¶9, Exhibit D]. The August Term Sheet contained, amongst other provisions, the Parties agreement to extend the due diligence period and time for the negotiation and execution of a final binding agreement for CCGI to acquire all the outstanding membership interests (and all economic benefit derived therefrom) of 350 Green (and which expressly included all 350 Green's assets including the Chicago Project) and prohibited

3

350 Green from taking, directly or indirectly, any action to initiate, solicit, negotiate or accept any offer from any person to sell the membership interests or assets of 350 Green.

Notwithstanding the August Term Sheet's express prohibition against 350 Green or its members from taking any action to sell the assets or membership equity interests of 350 Green to any other party, on February 11, 2013, a press release was issued by Defendant JNS Holdings Corporation ("JNS") announcing that JNS had entered into a Formal Letter of Intent with 350 Green to acquire "certain assets which consists of the Chicago area Grant Agreement, only." The 350 Members never advised CCGI that they had entered into negotiations with any other bidders for any part of 350 Green in violation of the August Term Sheet.

Despite the foregoing, on March 8, 2013, after an extensive period of due diligence and negotiation, the 350 Defendants, CCGI and 350 Holdings executed a document titled "Exchange Agreement" which, by its terms, was a final binding agreement to purchase 350 Green (hereinafter, the "Exchange Agreement") was governed in accordance with Florida law. The Exchange Agreement also, amongst other things, called for the transfer of one hundred percent (100%) of the membership interests of 350 Green (the "350 Interests") by 350 Holdings in exchange for the 350 Members receiving 1,111,111 shares of CCGI common stock. The consideration for payment to the 350 Members under the Exchange Agreement was based, in part, on the inclusion and value of the Chicago Assets. [Farkas Declaration, ¶16, Exhibit F]

The Exchange Agreement did not contain a "time of the essence" clause or a specific closing date or time, but called for the closing to take place no later than ten (10) business days after the "Effective Date". The Effective Date, as defined under the Exchange Agreement, is March 8, 2013. Therefore, under the terms of the Exchange Agreement, the closing thereunder was to occur sometime on or before March 22, 2013. No specific time or date for Closing was set forth in the Exchange Agreement or in any other subsequent writing between the Parties. In

4

addition, the Exchange Agreement contained no default provision, nor any language that allowed 350 Green and the 350 Members to terminate the Exchange Agreement in the event of any claimed default.  [Farkas Declaration, ¶17].

The 350 Members sent their executed signature pages to Plaintiffs on March 22, 2013. On that same date CCGI circulated a proposed amendment to the Exchange Agreement (the "Amendment") requesting a right of first refusal on any of the 350 Members' future business opportunities for one year, and a non-compete agreement between the 350 Members and CCGI. CCGI maintained that this request was standard in acquisition agreements of this kind, and the signing of the Amendment was not a condition of closing the Transaction.  [Farkas Declaration ¶19, Exhibit H, P007641, P007802-4].

The 350 Members and their agents, however, failed to respond to CCGI's request regarding the execution of the Amendment until after the proposed closing date of March 22, 2013 had passed.  On March 26, 2013, having received no written communications of any kind directly from the 350 Members either demanding a time of the essence closing or otherwise asserting a default by Plaintiffs under the Exchange Agreement, CCGI and 350 Holdings withdrew their request for any Amendment to be executed and provided their executed signature pages to 350 Green and the 350 Members.  At that time, Plaintiffs were informed indirectly through the 350 Members' agents, that 350 Green and the 350 Members considered the Transaction to be terminated, they refused to sign the Amendment, and they would "entertain options with other companies" for the sale of 350 Green  [Farkas Declaration, ¶24, Exhibit J, P008357- P008358].

At no time did CCGI or 350 Holdings ever state they did not intend to close the Transaction with 350 Green and the 350 Members, and as of March 26, 2013: (i) no written demand to close or notice of default had been provided from 350 Green and the 350 Members to

CCGI and/or 350 Holdings; (ii) all of the final closing documents were delivered between the Parties; and (iii) CCGI had begun the process of issuance of the CCGI Shares to the 350 Members in accordance with the Exchange Agreement [Farkas Declaration, ¶20].

As a result of the 350 Members' continuing refusal to close the Transaction as required under the Exchange Agreement and Florida law, on April 9, 2013, Plaintiffs filed the New York Action against 350 Green, the 350 Members, and JNS in the United States District Court for the Southern District of New York in the case entitled *Car Charging Group, Inc., et al. v. 350 Green, LLC and JNS Holdings Corporation*, under Case No.: 13-cv-2389.

On April 17, 2013 after JNS Holdings' counsel of record was served with the New York Action, thereby placing JNS on actual notice of the existence of a binding Exchange Agreement between CCGI, 350 Holdings, 350 Green and the 350 Members, 350 Green and JNS Power entered into an Asset Purchase Agreement (the "APA") wherein JNS Power agreed to purchase the one hundred sixty-eight (168) installed electric car chargers and fifty-one (51) chargers that were to be installed for the Chicago Project (the "Chicago Assets").

In April 22, 2013, the New York Action was settled by and between CCGI, 350 Holdings and 350 Green and the 350 Members, with CCGI, 350 Holdings and 350 Green and the 350 Members executing an Amendment to the Exchange Agreement and closing the Transaction without any finding that the Exchange Agreement had been terminated as erroneously alleged by 350 Green. The Chicago Assets, as well as certain liabilities associates with the Chicago Project, were specifically included in the addendum to the Exchange Agreement. Consequently, as of the closing under the Exchange Agreement, 350 Holdings owned and continues to own both one hundred percent (100%) of the member equity interests and all assets of 350 Green, which specifically includes the Chicago Assets [Farkas Declaration, ¶27].

6

III.    **Argument**

A.  *Legal Standard*

Summary judgment is warranted where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Becton Dickinson and Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990); *Southwall Technologies, Inc. v. Cardinal IG Co*., 54 F.3d 1570, 1575 (Fed. Cir. 1995). Material facts are those that might affect the lawsuit under the governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The court will draw all reasonable factual inferences in favor of the non-moving party. *Id*. "For the grant of summary judgment there must be no material fact in dispute, or no reasonable version of material fact upon which the non-movant could prevail." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001).   As demonstrated more fully herein, Plaintiffs are entitled to summary judgment on their Count I, Declaratory Judgment, as there is no genuine issue of material fact that the APA is void as a matter of law.

B.  *350 Green was bound to the Exchange Agreement at the time it executed the APA*

Plaintiffs' Count I requests that this Honorable Court declare the APA void as a matter of law because the Exchange Agreement was valid and binding on 350 Green at the time that 350 Green and JNS Power executed the APA.

It is undisputed that the Exchange Agreement did not contain a "time of the essence" clause or a specific closing date or time.  Instead, the Exchange Agreement states, in pertinent part, "…Closing shall take place no later than ten (10) business days after the Effective Date". The Effective Date, as defined under the Agreement, is March 8, 2013. Pursuant to the terms of the Exchange Agreement, the closing was to occur on or before March 22, 2013.

The terms of the Exchange Agreement are unambiguous and did not allow for the 350 Members to terminate the Exchange Agreement, and their conduct in attempting to do so was a complete violation of their obligations thereunder. As is evidenced by Section 1.2 thereof, all language purporting to set the closing date in the Exchange Agreement is perfunctory. There is no language in the Exchange Agreement that contemplates termination, default, breach or other remedy in the event of a failure to meet such date.

Under Florida law[1], it is well settled that a slight delay in consideration does not discharge a party's performance when time is not expressly of the essence in the contract. In Florida, time is not of the essence in contracts unless the contract so expressly provides. *Henry v. Ecker*, 415 So. 2d 137 (Fla. 5th DCA 1982). In *Westcap Government Securities, Inc. v. Homestead Air Force Base Federal Credit Union, et al.*, 697 F. 2d 911 (11th Cir. 1983), the Eleventh Circuit reversed a grant of summary judgment that was entered in favor of a buyer of securities, finding that as a matter of law, the buyer was not able to unilaterally terminate the agreement. In *Westcap*, the contract called for securities to be delivered to buyer by November 20th, however delivery did not take place until November 28th. The Court first noted that the "Credit Union's attempt, without notice to Westcap, to terminate the contract unilaterally is without legal justification, and Westcap is entitled to summary judgment." *Id* at 913. The Court went on to hold that:

> Interpreting Florida law, this circuit has held "it is elementary that the mere breach of an agreement which causes no loss to plaintiff will not sustain a suit by him for damages, much less rescission." *Block v. West Palm Beach*, 112 F.2d 949, 952 (5th Cir. 1940) (citation omitted) (affirming dismissal for failure to state a claim in suit by bondholders against city for breach of contract when bondholders made no showing of injury from city's breach of promise). Concerning tardy performance that does not cause damage to the complaining party, a Florida appellate court has observed,

---

[1] Florida law governs the Equity Exchange Agreement pursuant to Section 8.11, which states "this Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of Florida without giving effect to the choice of law provisions thereof."

8

> The modern trend of decisions concerning brief delays by one
> party in performance of a contract or conditions thereunder, in
> the absence of an express stipulation in the contract that time is
> of the essence, is not to treat such delays as a failure of a
> constructive condition discharging the other party unless
> performance on time was clearly an essential and vital part of
> the bargain.

*National Exhibition Co. v. Ball*, 139 So.2d 489, 492
(Fla.Dist.Ct.App.1962). In applying this general trend in contract law
to land sales agreements, the court reasoned:

> time is not of the essence for the reason that no substantial
> injury will normally result from the breach of a time term
> and it is therefore just to enforce the contract with due
> allowance for any damage rather than to discharge the party
> aggrieved by the failure to perform strictly on time.

*Id*. (citation omitted). Minor delay has also been held not to be a basis for
rescission in the context of construction contracts. See *Larsen v. Miami
Gardens Dev. Corp*., 299 So.2d 50 (Fla.Dist.Ct.App.1974). *Id* at 913-14.[2]

Florida's trend of excusing late performance under a contract was again followed in

*Inspiration Yacht Charters, Inc. v. Inspiration Yacht Charters II, Inc*., 488 Fed. Appx. 408; 2012

U.S. App. LEXIS 18831 (11th Cir. 2012), the Appellate Court upheld a district court's judgment

that a seller was entitled to half of a security deposit that was held in escrow.  In *Inspiration*, the

parties entered into an agreement for the sale of a yacht.  The closing documents were executed,

but the buyer refused to release the funds from escrow and required additional closing documents,

which were additionally provided.  However, six days after the closing was to occur, the buyer

---

[2] *See also*, *Burger King Corp. v. Mason,* 710 F. 2d 1480, 1490 (11th Cir., 1983):  "Pursuant to this rule,  the
Florida courts, and this court construing Florida law, have held that a party may not escape performance
under a contract on the ground that a tender was not made by the date specified in the contract. Rather, a
party who tenders late may enforce the contract with due allowance for any damage caused by the
tardiness. See, e.g., *Westcap Government Securities, Inc*., 697 F.2d at 914; *Blaustein v. Weiss*, 409 So2d
103 (Fla.Dist.Ct.App.1982); *Jackson v. Holmes*, 307 So.2d 470 (Fla.Dist.Ct.App.), cert. denied, 318 So.2d
404 (Fla.1975); *Larsen v. Miami Gardens Dev. Corp*., 299 So.2d 50 (Fla.Dist.Ct.App.1974); *National
Exhibition Co. v. Ball*, 139 So.2d 489 (Fla.Dist.Ct.App.1962). Indeed, a Florida court has refused to
countenance unilateral cancellation in that context even when the contract stipulated that time was of the
essence. *Jackson*, 307 So.2d at 471-472."

advised the sale had been terminated because the documents had not been provided on the day of closing. The district court determined it was the buyer that breached, and the Appellate Court affirmed, finding that the contract did not contain a "time is of the essence" clause. The Appellate Court agreed with the district court's finding that "the mere fact that an agreement specifies a particular date for closing does not by itself establish that failure to provide the documents at issue on that date constitutes breach." *Id* at 409.

Similar to the aforementioned cases, the Exchange Agreement did not specify a specific date of closing, and did not specify that time was of the essence. The Exchange Agreement only indicated that closing was to take place within 10 business days after execution. There is no indication in the Exchange Agreement that any party would suffer any injury, damage, or loss should the closing be delayed.

Under Florida law, time will be considered of the essence in a contract in three circumstances: (1) where there has been an explicit recital by the parties; (2) where the treating of time as a non-essential would produce a hardship, and delay by one party in completing or in complying with a term would necessarily subject the other party to a serious injury or loss; and (3) where an express notice has been given by a party not in default to the other party who is in default, requiring the contract to be performed within a stated time, which must be a reasonable time according to the circumstances. *Fertilizer Corp. of America v. P.S. Int'l, Inc.*, 729 F. Supp. 837,838 (S.D. Fla. 1989). As demonstrated, (i) there was no explicit recital that time was of the essence in the Exchange Agreement; (ii) there was no demonstration of damage to 350 Green or the 350 Members through the slight delay by the CCGI Entities; and (iii) neither 350 Green nor the 350 Members provided express notice to the CCGI Entities that the contract be performed within a stated time.

When time has not been made essential to the contract or has been waived, under Florida law which governs the Exchange Agreement, the party entitled to insist on performance must fix a definite date in the future for performance and must notify the other party, giving a reasonable time within which to comply. *McNeal v. Marco Bay Associates*, 492 So. 2d 778 (Fla. 2nd DCA 1986). It is undisputed that 350 Green never provided the CCGI Entities any notice of default, and never gave the 350 Entities any time to comply with performance. Instead, the 350 Members unilaterally terminated the Exchange Agreement.

The CCGI Entities were always ready and willing to close the Transaction. [Farkas Declaration ¶ 25], which continues to reflect the position that CCGI and 350 Holdings took in the New York Action. [Farkas Declaration, ¶25, Exhibit K]. The minor delay in closing based on the CCGI Entities' request that the 350 Members execute a non-compete agreement was a side agreement that did not have any effect on the terms of the Exchange Agreement. Said request did not permit the 350 Members to unilaterally terminate the Transaction. It is undisputed that the 350 Members never notified the CCGI Entities of any default under the Exchange Agreement, nor did they make any demand for the CCGI entities' performance under the Exchange Agreement or give the CCGI entities a reasonable time with which to comply [Farkas Declaration ¶ 24].

As the Exchange Agreement did not have a specific closing date, and the 350 Members did not insist on a date certain for closing or give the CCGI entities notice, the 350 Members could not claim that the Exchange Agreement was terminated. Consequently, as a matter of law, the Exchange Agreement was always binding on 350 Green and the 350 Members resulting in the 350 Members and 350 Green having no authority to execute the APA with JNS Power. Therefore, it is respectfully requested this Court find the APA is void as a matter of law.

**C. APA is void as a matter of law as JNS Power had knowledge of the existence of the Exchange Agreement at the time the APA was executed**

It is undisputed that in the New York Action, the CCGI Entities sought, among other relief, specific performance under the Exchange Agreement an injunction preventing the sale of any of 350 Green's assets to JNS Holdings, and to have the Court declare that the Exchange Agreement remained binding on the 350 Members. It is further undisputed that JNS Power was on notice as to these claims when the APA was executed on April 17, 2013, during the pendency of the New York Action. JNS Powers' knowledge of the claims made by the CCGI Entities against 350 Green and the 350 Members are reflected in the self-serving terms of the APA itself. Specifically, the APA states, in pertinent part:

> 1.2 Seller represents and warrants that they have terminated all other prospective terms sheets or proposals with any other entity, specifically CAR CHARGING GROUP, INC. ("CCGI"), for the purchase of the assets that are defined herein and that are being sold herein; and
>
> 1.3 Buyer represents that it has not contributed in any way to the termination of that relationship or interfered with the CCGI relationship;
>
> ****
>
> 3.3 Seller hereby agrees to indemnify and hold Buyer harmless from any and all liability, action, lawsuit, expenses or damages directly associated with CCGI's failure to close the Equity Exchange Agreement dated March 8, 2013 with Seller…

Consequently, as JNS Power had knowledge of the CCGI Entities' claims in the New York Action, and the APA was executed during the pendency of the New York Action by JNS Power despite such actual knowledge, the APA must be void as a matter of law. For the APA to be valid, JNS Power must have been without actual knowledge of any defect in title or any pending claim. Under the express terms of the Exchange Agreement, the 350 Members were not allowed to sell the Chicago Assets, as said assets were tied to the Exchange Agreement, which was binding at the

time the APA was executed. JNS Power, as a subsidiary of JNS Holdings, was on notice that the Chicago Assets were the subject of litigation in the New York Action.

The situation at bar is analogous to a bona fide purchaser that acquires an asset free of any adverse claim under the Uniform Commercial Code. A good faith purchaser is thus one that purchases (1) for value; (2) in good faith; and (3) without notice of adverse claims. see: *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978). It is well settled that the requirement that a good faith purchaser take without notice of adverse claims means that the purchaser must have no actual knowledge of the defects in the title to the assets bought, or knowledge of such facts and circumstances as would have put a man of ordinary circumspection upon inquiry. *In re Newton*, 64 B.R. 790; 1986 Bankr. LEXIS 5329 (Sept. 11, 1986).

This case before this Court is directly analogous to *Shacket v. Roger Smith Aircraft Sales, Inc.*, 651 F. Supp. 675 (N.D. Ill. Nov. 20, 1986). While *Shacket* deals with a dispute regarding the sale of an aircraft and the subsequent recording of an aircraft lien, the application of the Court's reasoning is applicable to the case at bar. In *Shacket*, buyers purchased an aircraft. The seller then gave its affiliate a bill of sale for the same aircraft, and the affiliate used the bill of sale to put the plane in its name and to secure a bank loan. When the buyers discovered the aircraft was not titled in their name, they sought declaratory judgment as to the title of the aircraft. The Court ultimately determined that the affiliate had actual knowledge of the buyer's ownership of the aircraft prior to obtaining the bill of sale, which ultimately precluded the affiliate from being a good faith purchaser. The Court noted that:

> Philko correctly draws on the general proposition that a buyer or mortgagee is entitled to priority based on whether he, she or it acquires an interest and gives value for it before receiving notice of prior unrecorded interests. *Life Savings & Loan Association of America v. Bryant*, 125 Ill.App.3d 1012, 1019, 467 N.E.2d 277, 282, 81 Ill. Dec. 577 (1st Dist. 1984). This Court concludes that principle applies here. Hence Philko's acquisition of actual knowledge of Shackets' interest before Bank sent the papers to the FAA, though such knowledge has been established despite McArdle's contrary testimony and Bishop's inaccurate recollection, becomes irrelevant.

*Id* at 691. This case, while not dealing with the purchase of aircraft, is analogous. It is clear from the plain language of the APA that JNS Power had knowledge of the CCGI Entities' interest in the Chicago Assets. JNS Power cannot, after the fact, take the position that it did not know that the ownership of the Chicago Assets, and therefore the 350 Members' ability to sell the Chicago Assets, were in dispute.

The concept that a buyer should perform due diligence to obtain knowledge of adverse claims of property is an old one. In *Lytle v. Lansing*, 147 U.S. 59; 13 S. Ct. 254; 37 L. Ed. 78; 1893 U.S. LEXIS 2143 (1892), the United States Supreme Court weighed in on a dispute involving bonds. A New York state court had voided a transaction involving a town's bonds that were issued to invest in railroad stock. After the transaction was voided by the Court, the bonds were subsequently sold by the railroad to a purchaser, who first tried to collect from the town, and after being unable to do so, sold them to a banker, who informed the rancher about the prior litigation, then sold them to the rancher in exchange for part of a ranch. The rancher then sued the town to collect on the bonds and lost, as the trial court found that the banker and the rancher were not "bona fide purchasers" because they knew of the prior litigation. The Supreme Court held that:

> While the notice received by the plaintiff may not have gone to the extent of informing him of the particular facts showing the invalidity of the bonds, he was informed that the town was contesting its liability, and that Brackenridge himself was in litigation with it over the payment of the coupons. Receiving this information as he did, not only from his vendor, but from his own attorneys, from whom he could have learned all the facts by inquiry, it is mere quibbling to say, that he had no notice that the bonds were invalid. While purchasers of negotiable securities are not chargeable with constructive notice of the pendency of a suit affecting the title or validity of the securities, it has never been doubted, as was said in *Scotland County v. Hill, 112 U.S. 183, 185*, that those who buy such securities from litigating parties with actual notice of a suit, do so at their peril, and must abide the result the same as the parties from whom they got their title. Under the circumstances, it was bad faith or wilful ignorance under the rule laid down in *Goodman v. Simonds, 20 How. 343*, and *Murray v. Lardner, 2 Wall. 110*, to forbear making further inquiries. No rule of law protects a purchaser who wilfully closes his ears to information, or refuses to make inquiry when circumstances of grave suspicion imperatively demand it.

While *Lytle's* facts may be distinguishable because it deals with bonds and not electric vehicle charging stations, the underlying concept behind the Supreme Court's holding, that a party that has knowledge that purchases assets that it knows are the subject of litigation does so at its own risk.

At best, JNS and the 350 Members entered into a "backup" contract that could only be valid if the Court in the New York Action found that the Exchange Agreement was, in fact, invalid. However, no court of competent jurisdiction made such a finding, but instead the 350 Members and the CCGI Entities resolved their differences and closed the Transaction. Consequently, JNS Power's actual knowledge of the existence of the Exchange Agreement and the New York Action act to invalidate the APA as a matter of law.

## IV. <u>Conclusion</u>

Based on the foregoing, this Court should issue partial summary judgment in favor of Plaintiffs on Count I of the Complaint and find the APA void as a matter of law. There is no genuine issue of material fact that the Exchange Agreement, which specifically included the assets that are at issue in this case, was never terminated, and in fact was always binding upon CCGI Entities, 350 Green, and the 350 Members. Consequently, there is no genuine issue of material fact that the APA executed on April 17, 2013 during the pendency of the New York Action between 350 Green and JNS Power, which had actual knowledge of the claims of the CCGI Entities, is void as a matter of law.

Dated:  August 5, 2013                    Respectfully submitted,


                                          Plaintiffs Car Charging Group, Inc.,
                                          350 Holdings, LLC and 350 Green, LLC


                                          By:      *s/Michael I . Bernstein*
                                                   One of their attorneys


Michael I. Bernstein, admitted *pro hac vice*
The Bernstein Law Firm
1688 Meridian Avenue, Suite 418
Miami Beach, Florida 33139
Telephone: (305) 672-9544
Facsimile: (305) 672-4572
e-mail: michael@bernstein-lawfirm.com

Steven L. Baron (ARDC No. 6200868)
Natalie A. Harris (ARDC No. 6272361)
Mandell Menkes LLC – Firm No. 38081
One North Franklin Street, Suite #3600
Chicago, Illinois 60606
Telephone: (312) 251-1000
Facsimile: (312) 251-1010
e-mail: sbaron@mandellmenkes.com
e-mail: nharris@mandellmenkes.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that Plaintiffs' Memorandum In Support Of Their Motion for Summary Judgment served upon counsel herein named by ECF and via e-mail and U.S. Mail on August 5, 2013:

Patrick E. Deady
Kelly McCloskey Cherf
Evan J. Haim
Hogan Marren, Ltd.
321 N. Clark Street, Suite 1301
Chicago, IL 60654
312-946-1800

*s/ Michael I. Bernstein*